UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATHAN W. CLOUSER, | : | 1:12-CV-01870 |
| | : | |
| Plaintiff | : | |
| | : | (Chief Judge Conner) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| TODD JOHNSON, *et al.,* | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

The plaintiff, Nathan W. Clouser, claims that the defendants violated his
constitutional rights in connection with criminal proceedings against him. For the
reasons that follow, we recommend that the defendants' motion for summary
judgment be granted in part and denied in part.

### II. Background and Procedural History.

Clouser, proceeding *pro se*, began this action by filing a complaint naming as
defendants the following officers: Todd Johnson, a detective in charge of the
Dauphin County Drug Task Force (task force); Regis Vogle, III, an officer with the

task force; and John Goshert, a supervisor of the Dauphin County Criminal Investigative Division (CID).   Clouser sued Vogel in his individual capacity, and he sued Johnson and Goshert in both their individual and official capacities.

Clouser claims that a March 2011 search of his residence violated his constitutional rights.   More specifically, Clouser alleges that defendant Johnson intentionally or with reckless disregard included false statements in the affidavit for probable cause for the search warrant and that those statements were necessary to the finding of probable cause.   According to Clouser, Johnson's false statements resulted in a warrant authorizing an illegal search in violation the Fourth Amendment, and defendants Vogle and Goshert were present and participated in the illegal search.   Clouser also claims that by making false statements in order to subvert the processes that are meant to protect against illegal searches and seizures, Johnson violated his Fourteenth Amendment due process rights.

After the search, Clouser alleges, he was arrested for attempt to manufacture Fentanyl and unlawful use of a communication device.   Clouser also alleges that defendant Johnson intentionally or with reckless disregard included false statements in the affidavit for probable cause for the warrant for his arrest, which, according to Clouser, rendered the arrest warrant illegal.   While Clouser acknowledges that there were other, valid warrants for his arrest for other outstanding charges, he alleges that

2

those other charges were dealt with on April 11, 2011, and, after that date, the only thing holding him in custody was the invalid arrest warrant.   Clouser claims that he suffered unlawful imprisonment in violation of the Fourth Amendment from April 11, 2011, until October 4, 2011.

According to Clouser, after his arrest, two packages were seized without a warrant and without probable cause.   One of the packages was sent through the United States mail.   The other was sent through UPS and was taken off the porch of his residence.   Clouser believes that Johnson altered the chain-of-custody documents to make it appear that the package sent via UPS was sent through the United States mail.   Clouser asserts that Johnson tried to hide his tampering with evidence, and, according to Clouser, this violated his Fourth Amendment, Fifth Amendment, and Fourteenth Amendment rights.

Clouser alleges that, on March 29, 2011, defendant Johnson had him transported to CID offices.   According to Clouser, he asked for an attorney. Clouser alleges that Johnson asked him to sign consent-to-search forms for two packages that were seized after his arrest as well as for six electronic devices that were seized during the original search.   Clouser asserts that he again asked for a lawyer.   According to Clouser, Johnson then responded that he did not believe that any attorneys were available, that it would help Clouser later if he signed the consent

forms, and that, if Clouser did not sign the forms, he would just get a search warrant anyway.   Clouser eventually relented and signed the forms.   According to Clouser, defendant Vogle was aware of his request for counsel, and Vogle witnessed him signing the consent forms.   Clouser claims that by asking him to sign the consent forms without his attorney, defendants Johnson and Vogle violated his Sixth Amendment right to counsel.

Clouser alleges that defendant Johnson repeatedly continued his preliminary hearing knowing that there was no probable cause to hold him and that a preliminary hearing would fail.   Clouser was federally indicted on October 5, 2011, and all local charges were withdrawn before a preliminary hearing was held.

Clouser further alleges that the defendants were involved in an incident in 2008 that was the subject of a federal lawsuit—*Perry v. Borough of Middletown,* 1:10-CV-00911 (Carlson, M.J.).   That case was dismissed, in April of 2011, after the parties settled the case.   According to Clouser, the defendants' involvement in that case shows a pattern of abuse and reckless disregard for civil rights by the defendants.

In response to motions to dismiss the complaint filed by the defendants, the Court dismissed all claims against defendant Goshert and all claims against defendant Vogel except the Sixth Amendment claim.   The Court also dismissed the

4

Fifth Amendment and substantive due process claims against defendant Johnson.

Thus, the remaining claims are the Sixth Amendment claim against defendants

Vogel and Johnson and the Fourth Amendment and procedural due process claims

against defendant Johnson.

Currently pending is a motion filed by defendants Johnson and Vogel seeking

summary judgment on the remaining claims.   The defendants contend that all of

Clouser's claims are barred by the favorable-termination rule of *Heck v. Humphrey*,

512 U.S. 477 (1994).   The defendants also contend that the claims against them in

their official capacities[1] are barred by sovereign immunity.   For the reasons

discussed below, we conclude that only one of Clouser's remaining claims is barred

by *Heck.*   We also conclude that the defendants have not established that they are

entitled to sovereign immunity.


## III. Discussion.

### A. Summary Judgment Standard.

The defendants have moved for summary judgment under Rule 56(a) of the

Federal Rules of Civil Procedure, which provides that "[t]he court shall grant

---

[1] We note that the complaint only expressly names defendant Vogel in his
individual capacity.

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

6

admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).   If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.   Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.   A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49.   When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N.*

*Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.   The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.   "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex,* 477 U.S. at 323).   "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal

8

memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

### B.   Undisputed Material Facts.

A party who seeks to resist a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party."   Under this Rule, the failure to follow these instructions and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed admitted.   Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).   Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner—whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.*

The defendants filed a statement of material facts, and Clouser filed a one-page response.   While Clouser purports to deny a few of the defendants' statement of facts, he has not cited evidence to support his denials.   Thus, in accordance with Local Rule 56.1, the defendants' statements of facts are deemed admitted for purposes of the pending summary judgment motion.   As such, the following facts taken from the defendants' statement of material facts are undisputed.

### 1. The Search Warrrant.

On March 14, 2011, Johnson submitted an application for a search warrant in which he was the affiant. *Doc. 96* at ¶1.   In the Affidavit of Probable Cause that was contained in that application, Johnson stated, "I have known Nathan Clouser for several years and assisted in his arrest and conviction for manufacturing "Molly" (MDMA) in 2003." *Id*. at ¶2.   But as Clouser correctly notes in his complaint, in 2003, he was charged with and pleaded guilty to delivery of heroin. *Id*. at ¶3.   It was in 2006 that Clouser was charged with and pleaded guilty to, *inter alia*, delivery of MDMA and possession, with intent to use, drug paraphernalia for the purpose of

manufacturing a controlled substance. *Id*. at ¶4.   In the affidavit of probable cause,

Johnson also stated:

> In the afternoon of March 3, 2011, I was able to speak with the confidential informant (C.I.).   The C.I. stated that Nathan Clouser and his girlfriend are heroin addicts. Cloused [sic] made a batch of Fentanyl last week which they used until it ran out. Clouser has spoken to the C.I. and indicated he was in the process of ordering chemicals from China to manufacture more Fentanyl.   Clouser has shown the C.I. glassware he used to make the last batch of Fentanyl.   Clouser went on to tell the C.I. what chemicals he was ordering and from where.
>
> Clouser and the C.I. are acquaintances and as such the C.I. is allowed to use Clouser's computer.   While using e-mail on the computer the C.I. came across a list of chemicals and places from which Clouser is attempting to purchase.   Clouser is using his E-mail to communicate with these companies in China. Clouser's E-mail address is entropy@yahoo.com.   The C.I. at no direction from the police copied these items and sent it to the investigation officer.
> . . .
> On March 3, 2011 I contacted the Drug Enforcement Administration, Lab Division in Quantico Virginia.   I spoke with Senior Forensic Chemist and coordinator of the North East Clandestine Lab Team Jack Fasanello.   I provided Fasanello with the list of chemicals provided by the C.I.   From the list of chemicals Fasanello determined that Clouser is attempting to make Fentanyl a schedule I substance.
>
> On March 4, 2011 I was contacted by the C.I. by text message.   The C.I. informed me that Clouser received a chemical at his apartment. (Molecular Seive Absorbent)   The C.I. said that [Clouser's girlfriend Amanda] Pickup received a chemical at her residence via UPS he needed for the manufacturing of Fentanyl.
>
> On March 7, 2011 I checked with UPS and they did deliver a package to 109 Hillside Hts. Millersburg Pa 17061.   I

11

was able to obtain a copy of the shipping order via UPS.   The
order was shipped to 109 Hillside Heights Millersburg PA 17061
in the name of Amanda Pickup.   The package was from Gordon
Post Lab Supply, 8893 Gulf Rd. North East Pa 16428 and
contained a hazardous material.

On March 7, 2011 I contacted Gordon Post Lab Supply.
The owner, Gordon Post provided me with the following
information.   Nathan Clouser placed an order for Pyridine on
2-26-11 and the lab shipped it out on 3-3-11.   The Pyridine was
shipped to Amanda Pickup at 109 Hillside Heights Millersburg
PA, 17061.   Clouser tried to order Sodium Boro Hydride but the
lab did not have any in stock.   Gordon Post did say that Clouser
was able to purchase Sodium Boro Hydride in November of
2010.   Gordon Post told me that Clouser provided
entropy@yahoo.com as his email address to track his order.

On March 7, 2011 I contacted the Drug Enforcement
Administration, Lab Division in Quantico Virginia.   I spoke
with Senior Forensic Chemist and Coordinator of the North East
Clandestine Lab Team Jack Fasanello.   Fasanello said
Molecular Sieve Absorbent and Pyridine are needed ingredients
in the manufacturing of Fentanyl.
. . .

On March 8, 2011 I executed a search warrant on Yahoo!
Inc.   On March 9, 2011 Yahoo! Provided [sic] me with
Clouser's e-mails which they had in there [sic] custody.   Several
of the e-mails made reference to purchasing various types of
chemicals.   There were e-mails in which he wired money to
china [sic] in return for chemicals.   I spoke with Senior Forensic
Chemist and Coordinator of the North East Clandestine Lab
Team Jack Fasanello.   I provided Clouser's e-mails to Fasanello
who is an expert in the manufacturing of Fentanyl.

On March 14, 2011 I received confirmation from
Fasanello that Clouser and Pickup have ordered on line and
obtained the components to produce Fentanyl.   These
components are listed in the e-mails from Clouser to various
chemical companies.   These components in the same location

12

constitute criminal attempt to manufacture Fentanyl even if the
conversion has not taken place yet.

*Id*. at ¶5.   In support of his statements in the affidavit of probable cause that Clouser

had obtained the components necessary to manufacture Fentanyl, Johnson relied on

the analysis of an expert in the manufacturing of Fentanyl, Senior Forensic Chemist

and Coordinator of the North East Clandestine Lab Team Jack Fasanello from the

Drug Enforcement Administration, which analysis was conveyed to him through

several telephone conversations. *Id*. at ¶6.   The application for a search warrant was

approved by a judge on March 14, 2011. *Id*. at 7.


### 2. The March 15, 2011 Search and Arrest.

On March 15, 2011, Johnson and Vogel, as well as other members of the

Dauphin County Drug Task Force, the Pennsylvania State Police (PSP) and the Drug

Enforcement Administration (DEA) executed the search warrant. *Id*. at ¶8.   Upon

entry by the officers, Clouser was immediately taken into custody and advised of his

*Miranda* rights. *Id*. at ¶9.   After the search, but before leaving the site, DEA

chemists participating in the search advised Johnson that the items necessary to

produce Fentanyl were found at the site. *Id*. at ¶10.

After the search was completed, Clouser was placed under arrest due to

outstanding bench warrants, and he was again advised of his *Miranda* rights. *Id*. at

13

¶11.   He was then transported to Central Booking in Harrisburg, Pennsylvania,

arraigned, and remanded to the Dauphin County Prison in lieu of $250,000.00 bail.

*Id*. at ¶12.


### 3. The Arrest Warrant.

On March 15, 2011, after execution of the search warrant, Johnson filed a

criminal complaint in which he was the affiant and in which he requested that a

warrant be issued for Clouser's arrest. *Id*. at ¶16.   In the affidavit of probable cause

that was contained in the criminal complaint, Johnson stated:

> On March 15, 2011 Members of the DEA, PSP and the
> DCDTF executed a search warrant at the residence of Nathan
> Clouser.   Clouser had been ordering chemicals and lab
> equipment on his computer with the intent to manufacture
> Fentanyl.   The search warrant yielded the items to produce
> Fentanyl.   This was confirmed by chemists from the DEA
> laboratory who were on scene during the execut[ion] of the
> search warrant.

*Id*. at ¶17.   Johnson relied on statements by DEA chemists participating in the

March 15, 2011 search that the items necessary to produce Fentanyl were found at

the site. *Id*. at ¶18.   The arrest warrant for Clouser was issued on March 15, 2011.

*Id*. at ¶19.

14

**4. The United States Postal Service Package and Clouser's Meeting with Johnson and Vogel.**

On March 17, 2011, Clouser met with an intake person from the Dauphin County Public Defender's Office and filled out the paperwork requesting a public defender. *Id*. at ¶20.   No public defender ever entered an appearance on Clouser's behalf regarding the state criminal charges, and, prior to March 29, 2011, Clouser was never advised that his case had, in fact, actually been assigned a public defender or of the name of the public defender who was purportedly to be representing him regarding the state charges. *Id*. at ¶21.

On March 7, 2011, the PSP requested that U.S. Postal Inspector Joseph Corrado check for names receiving mail at both of Clouser's addresses. *Id*. at ¶22. Pursuant to PSP's request, on March 29, 2011, Inspector Corrado provided to Johnson a package addressed to Clouser from China. *Id*. at ¶23.   On that same date, at Johnson's direction, Clouser was transported from the Dauphin County Prison to the Dauphin County CID offices. *Id*. at ¶24.   Johnson asked Clouser whether he had gotten an attorney yet, and Clouser advised Johnson that he had met with an intake worker, not an attorney, from the Dauphin County Public Defender's Office. *Id*. at ¶25.   Johnson told Clouser that he would contact the Dauphin County Public Defender's Office and see if someone was available. *Id*. at ¶26.   Johnson placed a

15

call to the Dauphin County Public Defender's Office, and he was advised that no

attorney was available at that time. *Id*. at ¶27.   Johnson then conveyed this

information to Clouser and asked Clouser to sign consent-to-search forms for, *inter*

*alia*, a United States Postal Service package addressed to Clouser from Zhejiana,

China. *Id*. at ¶28.   Clouser agreed to sign the forms and Vogel was a witness to his

signature. *Id*. at ¶29.   Neither Johnson nor Vogel threatened Clouser in any way,

and Clouser agreed to sign the consent-to-search forms because he believed that any

evidence obtained would later be thrown out. *Id*. at ¶30.


### 5. The UPS Package.

A package shipped to Clouser through United Parcel Service (UPS) from

Elemental Scientific, LLC, in Appleton, Wisconsin, was also obtained as part of the

criminal investigation. *Id*. at ¶31.   Clouser never executed a consent-to-search form

regarding the UPS package, and it has never been opened. *Id*. at ¶32.   As of this

date, it remains, unopened, in the Dauphin County evidence locker. *Id*. at ¶33.


### 6. Clouser's Guilty Plea.

Clouser was indicted by a grand jury on federal criminal charges related to the

same investigation on October 5, 2011. *Id*. at ¶34.   Clouser pled guilty to some of

the federal criminal charges and was sentenced to eight years in Federal prison. *Id*. at

¶35.[2]   The effective date of Clouser's federal sentence is April 11, 2011, which

gives him credit for all time he was in jail after his outstanding warrants were

resolved. *Id*. at ¶36.

_____

[2] The court may take judicial notice of adjudicative facts that are not subject to reasonable dispute because they are "generally known within the trial court's territorial jurisdiction" or because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2).   The docket and documents in Clouser's federal criminal case—*United States v. Clouser,* 1:11-cr-00282 (M.D.Pa.)—are public records of which we can take judicial notice. *See Wilson v. McVey*, 579 F. Supp. 2d 685, 688 (M.D. Pa. 2008)(taking judicial notice of court docket); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999)(stating that the court "may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity").   According to the docket in Clouser's federal criminal case, after he was indicted for manufacturing, distributing, and possessing with the intent to manufacture and distribute a mixture and substance containing a detectable amount of Fentanyl and methamphetamine, he waived his right to prosecution by indictment and consented to prosecution by information, and he was charged by a superseding information with two counts of using a communication facility in causing and facilitating the commission of a drug offense in violation of 21 U.S.C. § 843(b).   He then pleaded guilty to the two counts in the superseding information and, on June 11, 2012, Judge Jones sentenced Clouser to a total of 96 months imprisonment.

**C. The Favorable-Termination Rule of *Heck v. Humphrey* Bars Clouser's Claim Regarding his Confinement in 2011 But Not his Search Claims or his Sixth Amendment Claim.**

The defendants contend that the favorable-termination rule of *Heck v. Humphrey*, 512 U.S. 477 (1994) bars all of Clouser's remaining claims.   In other words, defendants argue that *Heck* defers the accrual date of Clouser's claims until such time as his conviction is set aside.   Applying the Supreme Court's clarification of the *Heck* principle announced in *Wallace v. Kato*, 549 U.S. 384 (2007), however, we find that only Clouser's claim relating to his confinement from April 11, 2011, until October 4, 2011, is barred by *Heck*'s favorable-termination rule.   In contrast, Clouser's Fourth Amendment search claims[3] and Sixth Amendment right-to-counsel claim, although all stemming from the underlying criminal

---

[3] Clouser's search claims are based on both the search of his residence and on the later searches of the packages.   Clouser's procedural due process claim, in turn, is based on the searches.   Clouser's procedural due process claim is intertwined with the Fourth Amendment claims; however, the defendants have not motioned for summary judgment on that claim.   Thus, we do not separately address the procedural due process claim.

proceedings, accrued at earlier point in time than his confinement claim, and thus are

not precluded by *Heck*.[4]

    In *Heck,* the United States Supreme Court held that "in order to recover

damages for allegedly unconstitutional conviction or imprisonment, or for other

harm caused by actions whose unlawfulness would render a conviction or sentence

invalid, a Section 1983 plaintiff must prove that the conviction or sentence has been

reversed on direct appeal, expunged by executive order, declared invalid by a state

tribunal authorized to make such [a] determination, or called into question by a

federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.* at 486-87,

490 (footnote omitted).   "Thus, when a state prisoner seeks damages in a

§ 1983 suit, the district court must consider whether a judgment in favor of the

plaintiff would necessarily imply the invalidity of his conviction or sentence; if it

would, the complaint must be dismissed unless the plaintiff can demonstrate that the

conviction or sentence has already been invalidated." *Id.*

    The rationale of the Court in *Heck* was based, in part, on a desire to avoid

parallel litigation over the issues of probable cause and guilt, to prevent the creation

───────────────────

4 The defendants contend only that the claims are barred by *Heck*.   They do not seek
summary judgment on the merits of the claims, and so we have not undertaken an
analysis of the merits.

of two conflicting resolutions arising out of the same transaction, and to preclude a convicted criminal defendant from collaterally attacking a conviction through a civil suit. *Royal v. Durison,* 254 F. App'x 163, 165 (3d Cir. 2007).   Even if the plaintiff has exhausted available state remedies, his § 1983 cause of action is deferred unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus. *Heck,* 512 U.S. at 489.

In *Wallace,* the Supreme Court, drawing on the specific language of *Heck,* explained that:

> [T]he *Heck* rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has *not* been . . . invalidated,' that is to say, an 'outstanding criminal judgment.' It delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn.

*Wallace*, 549 U.S. at 393 (emphasis in original) (quoting *Heck*).

Further, the Supreme Court instructed that, although the statute of limitations applicable to a 42 U.S.C. § 1983 action is determined by state law, the accrual date of such an action is a question of federal law. *Id.* at 388.   Generally, a cause of action accrues when a plaintiff has a complete and present cause of action, *i.e.,* when the plaintiff can file suit and obtain relief. *Id.*   Noting that § 1983 actions "sometimes accrue before the setting aside of—indeed, even before the existence

20

of—the related criminal conviction," the Supreme Court, referencing the common law, distinguished when accrual occurs in the false arrest and false imprisonment context from the timing of accrual for the tort of malicious prosecution, the cause of action in *Heck*.   Thus, in the false arrest context, the cause of action accrues and the statute of limitations normally commences to run from the date of the arrest. *Id.* at 388-89.   However, when a person is subject to false imprisonment, which is detention without legal process, after an arrest, the limitations period does not begin to run until the false imprisonment ends, which is when the person is held subject to legal process. *Id.* at 389-90 (observing that the tort of false imprisonment is subject to a "distinctive" accrual rule derived from the reality that victim may not be able to bring suit until after the imprisonment without legal process ends and that once legal process is instituted the action becomes one of malicious prosecution for the wrongful institution of the legal process).

Based on these principles, the Court held that where an arrest is followed by criminal proceedings, the statute of limitations as to a Fourth Amendment false-arrest claim begins to run at the time the claimant becomes detained pursuant to legal process. *Id.* at 397.   In so holding, the Court rejected Wallace's argument that, under *Heck,* the false-arrest claim did not accrue until after the State dropped the criminal charges against him. *Id.* at 392-97.

21

The Court explained that Wallace sought "the adoption of a principle that goes well beyond *Heck:* that an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside." *Id.* at 393 (emphasis is original).   Such a rule would require speculation regarding whether a prosecution would actually be brought, whether a conviction would necessarily ensue, and whether the civil action would impugn that conviction.   *Id.* at 394.   In refusing to adopt such a "bizarre extension of *Heck,*" the Court clarified that *Heck* applies only when there is an outstanding criminal judgment at the time the §1983 cause of action accrues and "delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn." *Id.* (emphasis is original).   Because there was no outstanding criminal conviction against Wallace at the time that he became held pursuant to legal process, *Heck* did not apply to delay the accrual of the false-arrest claim. *Id.*

A few years after *Wallace,* the Third Circuit held, in a selective-enforcement case, that *Wallace* supplanted its prior interpretation of *Heck.   Dique v. New Jersey State Police*, 603 F.3d 181, 188 (3d Cir. 2010) (supplanting the *Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427 (3d Cir. 2005) fact-based approach in light of *Wallace*).   The Third Circuit stated

22

that in selective-enforcement cases it "will no longer require that the complainant have been convicted and have had that conviction reversed, expunged or invalidated." *Id.* It recognized that if it "were to do so, [it] would be putting the complainant in the 'bizarre extension of *Heck'* where the cause of action might never accrue if there were no prosecution or if there were a dismissal or an acquittal." *Id.* (quoting *Wallace,* 549 U.S. at 393).

Although *Wallace* directly addressed only the accrual of a Fourth Amendment false-arrest claim (and *Dique* directly addressed only a selective-enforcement claim), the reasoning of *Wallace* also applies to search claims. *See Hornback v. Lexington-Fayette Urban Cnty.,* 543 F. App'x 499, 502 (6th Cir. 2013); *Hilton v. Whitman,* Civil Action No. 04-6420 (SDW), 2008 WL 5272190, at *8-9 (D.N.J. Dec. 16, 2008); *Troutman v. Bartlett,* Civil Action No. 11-315Erie, 2012 WL 6808559, at *5 (W.D. Pa. Dec. 4, 2012)(Report and Recommendation of Magistrate Judge), *adopting Report and Recommendation,* 2013 WL 85252 (W.D. Pa. Jan. 8, 2013).

## 1. Search Claims.

We conclude, therefore, that, under the reasoning of *Wallace,* Clouser's search claims are not barred by *Heck.* Clouser's search claims accrued at the time

of the searches at issue, for it was on the date of such searches that he possessed complete and present causes of action for which he could seek damages. *Woodson v. Payton*, 503 F. App'x 110, 112 (3d Cir. 2012)("Woodson's § 1983 claim accrued when the search and seizure occurred on October 8, 2009—in other words, the moment that Woodson indisputably knew about the alleged faults of [the] search and seizure."); *see also Sanders v. Downs*, 420 F. App'x 175, 179 (3d Cir. 2011)("*Heck* does not typically bar actions for Fourth Amendment violations, such as those Sanders alleges."). At that time, there was no outstanding conviction against Clouser. As such, *Heck* does not bar Clouser's search claims. As the searches allegedly occurred in 2011, and Clouser filed this suit in September of 2012, Clouser's claims are similarly not barred by the applicable two-year statute of limitations.

We note that defendant Johnson relies on a number of unpublished decisions to support of his contention that Clouser's claims are barred by *Heck.* To the extent that those cases rely on *Gibson* and similar cases*,* but not *Wallace* or *Dique*, we do not find them persuasive. *See e.g., Mosby v. O'Brie*, 532 F. App'x 84, 86 (3d Cir. 2013)(citing *Gibson,* but not *Wallace* or *Dique,* to support the conclusion that false arrest/false imprisonment claim is barred by *Heck*).

**2. Claim Based On Confinement From April 11, 2011, until October 4, 2011.**

Clouser alleges that defendant Johnson intentionally or with reckless disregard included false statements in the affidavit for probable cause for the warrant for his arrest.   According to Clouser, the false statements rendered the arrest warrant illegal.   While Clouser acknowledges that there were other, valid warrants for his arrest for other outstanding charges, he alleges that those other charges were dealt with on April 11, 2011, and, after that date, the only thing holding him in custody was the invalid arrest warrant.   Clouser claims that he suffered unlawful imprisonment in violation of the Fourth Amendment from April 11, 2011, until October 4, 2011.

While Fourth Amendment false-arrest/false-imprisonment claims are not necessarily barred by the favorable-termination rule of *Heck*, Fourth Amendment malicious prosecution claims are.   "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace,* 549 U.S. at 388.   Together false arrest and false imprisonment are referred to as false imprisonment. *Id.* at 389.   False imprisonment refers to detention without legal process. *Id.*   "Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when,

for example, he is bound over by a magistrate or arraigned on charges." *Id.* (italics in original). "Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process." *Id.* at 390 (italics in original)(quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Law of Torts § 119, p. 888 (5th ed. 1984)).

In this case, given that Clouser was arrested pursuant to a warrant and that he is seeking damages for his confinement for a period after he had been arraigned and after a criminal complaint had been filed against him, Clouser's claim based on his confinement from April to October of 2011 is a malicious-prosecution claim rather than a false-arrest/false-imprisonment claim. *See Xenos v. Hawbecker*, 441 F. App'x 128, 132 (3d Cir. 2011)("Since Xenos challenges his arrest and detention pursuant to a warrant and criminal information, his claims are more accurately characterized as malicious prosecution claims than false imprisonment claims."); *Myers v. Koopman,* 738 F.3d 1190, 1195 (10th Cir. 2013)(holding that detention after an arrest "pursuant to a validly issued—if not validly supported—arrest warrant" raises a claim of malicious prosecution), *petition for cert. filed,* (U.S. March 19, 2014). A malicious-prosecution claim is barred absent a favorable termination. *Heck,* 512 U.S. at 484-490 (analogizing tort of malicious prosecution to § 1983 actions that

seek to recover damages for unconstitutional conviction or imprisonment); *Xenos,* 441 F. App'x at 132 ("*Heck* likewise bars Xenos's challenge to his arrest, which was effectuated pursuant to legal process, i.e., a bench warrant and related criminal information.").   Here, the criminal proceedings have not terminated in Clouser's favor.   Accordingly, his claim based on his confinement from April of 2011 until October of 2011 is barred by the favorable-termination rule of *Heck.*

### 3. Sixth Amendment Claim.

According to Clouser, on March 29, 2011, defendants Johnson and Vogel violated his Sixth Amendment right to counsel by asking him to sign consent-to-search forms without his attorney present.

The Sixth Amendment, which applies to the States through the Fourteenth Amendment, provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." U.S. Const. amend. VI.   "The core of this right has historically been, and remains today, 'the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial.'" *Kansas v. Ventris*, 556 U.S. 586, 590 (2009).   While the core of the right to counsel is a trial right, "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a

27

defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)(quoting *United States v. Wade,* 388 U.S. 218, 227–228 (1967)).   "Critical stages include arraignments, postindictment interrogations, postindictment lineups, and the entry of a guilty plea." *Missouri v. Frye*, 132 S. Ct. 1399, 1405 (2012).   "[T]he right covers pretrial interrogations to ensure that police manipulation does not render counsel entirely impotent—depriving the defendant of 'effective representation by counsel at the only stage when legal aid and advice would help him.'" *Ventris,* 556 U.S. at 591 (quoting *Massiah v. United States,* 377 U.S.201, 204 (1964)(quoting *Spano v. New York,* 360 U.S. 315, 326 (1959)(Douglas, J., concurring)).   The Sixth Amendment "right to be free of uncounseled interrogation" "is infringed at the time of the interrogation." *Id.* at 592.   "The constitutional violation occurs when the uncounseled interrogation is conducted." *Id.*

The defendants have not articulated how success on Clouser's Sixth Amendment claim would imply the invalidity of his conviction.   Clouser's Sixth Amendment claim is in the nature of an uncounseled-interrogation claim, and a violation of the Sixth Amendment occurs in that setting when the uncounseled interrogation is conducted.   Thus, such a claim accrues at the time of the interrogation.   In this case, any violation of the Sixth Amendment occurred on

28

March 29, 2011, a time when there was no outstanding conviction against Clouser.

Under the rationale of *Wallace—i.e.,* that *Heck* applies only when there is an

outstanding criminal judgment at the time the §1983 cause of action accrues—we

conclude that Clouser's Sixth Amendment claim is not barred by *Heck. See Ventris*

*v. Kansas,* 11-3013-SAC, 2012 WL 4933324, at *3-4 (D. Kan. Oct. 16,

2012)(holding that Sixth Amendment claim was barred by statute of limitations

because the claim accrued at the time of interrogation, rather than under *Heck* only

after a favorable termination of the criminal proceedings, and "[a] judgment for

monetary damages in this case for the violation of Plaintiff's Sixth Amendment

rights would not necessarily imply the invalidity of his underlying criminal

conviction"), *aff'd*; 516 F. App'x 688 (10th Cir. 2013); *cf. Franklin v. Burr*, 535 F.

App'x 532, 533-34 (7th Cir. 2013)(holding that *Heck* did not apply to a claim that

the police and a state prosecutor violated the plaintiff's privilege against

self-incrimination when they interrogated him after he requested counsel); *but see*

*Lenhart v. Pennsylvania*, CIV.A. 11-312, 2012 WL 6562756, at *10 (W.D. Pa. Nov.

1, 2012)(report of Magistrate Judge recommending that *Heck* barred Sixth

Amendment claim, assuming there was a Sixth Amendment violation, based on

testimony of jailhouse informant because prevailing on that claim would imply the

invalidity of the plaintiff's conviction), *adopting Report and Recommendation*, 2012

29

WL 6562749 (W.D. Pa. Dec. 17, 2012), *aff'd, Lenhart v. Pennsylvania,* 528 F.

App'x 111, 113 (3d Cir. 2013)(affirming without discussion of the Sixth

Amendment claim).

### D. The Defendants Have Not Established that They Are Entitled to Immunity from the Claims Against Them in Their Official Capacities.

Defendants fail to provide sufficient factual support for this court to decide

the issue of whether they are entitled to sovereign immunity, thus necessitating

denial of summary judgment on this basis.   Defendants argue that the Pennsylvania

Office of Attorney General's (OAG) drug task forces are created pursuant to 53

Pa.C.S. § 2303 which authorizes intergovernmental cooperation, and that such task

forces are considered "requests for aid or assistance" from the OAG, and pursuant to

the Municipal Police Jurisdiction Act, 42 Pa.C.S. § 8953(d).   Thus they claim,

when responding to such requests for aid, officers participating in task force

operations are considered Commonwealth employees and thus absolutely immune.

It is well-settled that the Eleventh Amendment of the Constitution "provides

unconsenting states with immunity from suits brought in federal courts by private

parties." *Febres v. The Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d. Cir. 2006).

"[C]ounties, municipalities, and political subdivisions of a state [however] are not

protected by the Eleventh Amendment." *Jordan v. Cashman*, Civ.A.No. 11-1148, 2011 WL 2039170, at *21 (E.D. Pa. May 24, 2011); *Febres*, 445 F.3d at 229 (citing *Mt. Healthy City School Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274, 280 (1977), and *Bolden v. SEPTA*, 953 F.2d 807, 814 (3d Cir. 1991)).   "Generally, Eleventh Amendment immunity also extends to state officials sued in their official capacity because in such a case the state is the real party in interest." *Barnes*, 2011 WL 1398399 at *12 (citing *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990)).   Eleventh Amendment immunity, also applies to "entities which are arms of the state . . . as well as to the officials of such entities, acting in their official capacities." *Jordan*, 2011 WL 2039170, at *20.

In support of their sovereign immunity defense, defendants offer a generally worded declaration of Lawrence Cherba, the Executive Deputy Attorney General of the OAG, Criminal Law Division, who is responsible for oversight of all of the OAG's Municipal Drug Task Forces and execution of and implementation of all the Municipal Drug Task Force Agreements. *Doc.* 94-4.   Cherba broadly declares that the Municipal Drug Tasks Forces are created pursuant to 53 Pa.C.S. § 2303 and the task forces are "requests for aid" from the Attorney General pursuant to 42 Pa.C.S. § 8953(a)(3). *Id.*   According to Cherba, "although Municipal Drug Task Force

officers are employed by the respective counties County [sic], they are considered

Commonwealth employees when participating in task force operations." *Id.*

Defendants further offer a sample standard Municipal Drug Task Force

Agreement ("Agreement"), attached to the Cherba declaration.   *Doc. 94-4*.   The

Agreement provides in pertinent part:

> 2.      An employee of a party to this Agreement shall remain an
> employee of his or her employer for the purposes of any activity
> under this Agreement and each party shall maintain and be
> responsible for all employee compensation, benefits, insurance,
> and other incidents of employment except as provided herein.
> 'No municipal employee assigned under this Agreement shall be
> deemed to be an employee of the Commonwealth of
> Pennsylvania except as provided in Act 100 of 1989.'[5]

The Agreement further provides:

> 4.      **Liability**.
>
> Each party shall be an independent contractor and responsible
> for its own employees and for the acts of its employees under this
> Agreement pursuant to law.   Each party shall provide such
> public liability and other insurance as appropriate to protect
> against any claims arising out of that party' performance under
> this Agreement and not otherwise provided.

Defendants, however, fail to knit their supporting exhibits together to form an

argument free of material issues of fact.   The Cherba declaration is wholly lacking

---

[5] Act 100 of 1989 refers to the amendment to 42 Pa.C.S. § 8953 Statewide
Municipal Police Jurisdiction, adding the current language to § (d).

32

in any specifics regarding the relationship between the OAG and the Dauphin County Drug Task Force in general and in connection with the particulars of the Clouser case.   Additionally, the Agreement is merely a template and not an actual agreement between the Dauphin County Drug Task Force and the OAG that would have been in place during the relevant time period of the events in this case.   Based on this record, and viewing the facts in the light most favorable to Clouser which we are required to do, summary judgment is unwarranted.

## IV. Recommendation.

Accordingly, for the foregoing reasons, **IT IS RECOMMENDED** that the defendants' motion (doc. 93) for summary judgment be granted in part and denied in part.   It is recommended that defendant Johnson be granted summary judgment on Clouser's claim based on his confinement from April 11, 2011 until October 4, 2011.   It is recommended that the defendants' motion for summary judgment be denied in all other respects.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the

disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.   Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.   The briefing requirements set forth in Local Rule 72.2 shall apply.   A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.   The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.   The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of May, 2014.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge